# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

UNITED STATES OF AMERICA,

    Plaintiff

v.

MYRON MOTLEY,

    Defendant

Case No.: 3:19-cr-00027-LRH-WGC-2

**Order**

Re: ECF No. 59

Before the court is defendant Myron Motley's emergency motion to reopen detention hearing due to the COVID-19 Pandemic, referred to the undersigned by District Judge Larry R. Hicks. (ECF Nos 59, 59-1 to 59-3.) On June 24, 2019, the court ordered Motley detained pending trial, and he has been in custody since. (ECF No. 29.) Motley now requests that he be released, arguing that current global pandemic involving COVID-19 presents a compelling reason to grant release both because of the health risk posed by the virus as well as the impact it will have on his ability to prepare his defense. The Government opposes his request. (ECF No. 62.) Motley filed a reply brief. (ECF No. 63.) The court has reviewed the briefing, and for the reasons stated below, denies Motley's motion.

## I. BACKGROUND

In this case, and related case 3:19-cr-00026-LRH-WGC-1, on May 23, 2019, a federal grand jury returned a pair of indictments charging Motley with conspiracy to distribute oxycodone, conspiracy to distribute methamphetamine, five counts of distribution of oxycodone, and distribution of hydrocodone. (ECF Nos. 1, 4.) Motley initially appeared in the Northern

District of California following his arrest, and was ordered released by a judge in Oakland, California; however, the release order was stayed for a period of time pending remand of Motley to the District of Nevada and consideration of the Government's motion for revocation of the release order by the District of Nevada.

District Judge Larry Hicks ordered Motley remanded to the District of Nevada on June 14, 2019. On June 20, 2019, Motley appeared before the undersigned for his initial appearance/arraignment and plea, and entered a plea of not guilty. (ECF No. 21.) Judge Hicks held a detention hearing on June 24, 2019. Judge Hicks ordered Motley detained pending trial, finding that no condition or combination of conditions of release could reasonably assure Motley's appearance at trial (*i.e.,* he was a flight risk), indicating: the weight of the evidence against Motely was strong; he would be subject to a lengthy period of incarceration if convicted; he had a prior criminal history; and, he had a lack of stable employment. (ECF No. 29.)

Motley is currently housed at the Washoe County Detention Facility (WCDF), operated by the Washoe County Sheriff's Office (WCSO), in Reno, Nevada. Motley seeks an order for release from custody because of the health risks posed by the current global pandemic involving COVID-19, arguing that this is a compelling reason to grant release, and that temporary release is necessary to prepare his defense.

## II. LEGAL STANDARD

"A person lawfully committed to pretrial detention has not been adjudged guilty of any crime. He had only a judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest." *Bell v. Wolfish*, 441 U.S. 520, 536-37 (1979) (internal quotation marks and citation omitted). The government may detain someone on a federal offense to ensure his presence at trial and may subject him to the restrictions and conditions of detention

so long as those conditions do not constitute punishment or otherwise amount to a constitutional violation. *Id*.

The Bail Reform Act of 1984 mandates every person charged with a federal offense be given a detention hearing. 18 U.S.C. § 3142(a). The fundamental precept of the Bail Reform Act mandates the release of individuals so long as the court can be reasonably assured the defendant does not pose a flight risk or danger to the community. 18 U.S.C. § 3142. To the extent that conditions, or a combination of conditions, can be fashioned to reasonably provide for such assurances, the individual must be released, as detention is "the carefully limited exception." *Id.*; *see also United States v. Salerno*, 481 U.S. 739, 755 (1987). If the judge finds the defendant poses a danger to public safety or a flight risk, the defendant may be ordered detained. 18 U.S.C. § 3142(f).

18 U.S.C. § 3142(f)(2) permits a judicial officer to reopen a detention hearing at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the detention hearing and *that has a material bearing on the issue of whether there are conditions of release that will reasonably assure the appearance of such person and the safety of the community*.

Some district courts have considered requests for release from detention due to COVID-19 concerns in the context of the section 3142(f)'s pretrial detention framework and the related subsections (§ 3142(e)(2-3), statutory rebuttable presumptions; § 3142(g), Bail Reform Act factors). *See e.g. United States v. Martin*, No. PWG-19-140-13, 2020 WL 1274857, at *4 (D.Md. Mar. 17, 2020) (defendant raised concerns regarding his underlying medical conditions of asthma, high blood pressure and diabetes in that context); *United States v. Stephens*, ---F.Supp.3d---, 15-cr-95 (AJN), 2020 WL 1295155, at *2 (S.D.N.Y. March 19, 2020) (court

considered motion to reopen detention under section 3142(f) based on a change in circumstances with respect to speculative COVID-19 concerns, and reopening detention not only based on COVID-19 concerns, but relying on new information that weakened the Government's case and undermine the prior findings relative to detention).

Others have analyzed a request for release due to COVID-19 concerns under 18 U.S.C. § 3142(i) (citations set forth below). Section 3142(i) provides that a judicial officer may allow temporary release of a defendant if: (1) release is necessary for preparation of the defense; or (2) for another compelling reason.

A defendant's concerns that he faces heightened COVID-19 risk if incarcerated would not typically factor into a section 3142(f) analysis, which focuses on whether the court can fashion conditions of release that will reasonably assure the defendant is not a risk of nonappearance or a risk of harm to any others or the community. *United States v. Clark*, No. 19-40068-01-HLT, 2020 WL 1446895, at *3 (D. Kan. Mar. 25, 2020). The risk of *harm to a defendant* does not usually bear on this analysis; rather, whether a defendant's particular circumstances warrant release in light of the COVID-19 pandemic is more properly considered on a case-by-case basis under section 3142(i). *See id.; United States v. Hamilton*, 19-CR-54-01 (NGG), 2020 WL 1323036, at *2 (E.D.N.Y. Mar. 20, 2020).

In his reply brief, Motley states that he is moving for release both under 3142(f) and 3142(i); however, the opening brief does not make that clear. Instead, it contains a paragraph that states generally that the COVID-19 pandemic is a changed circumstance and focuses mainly on section 3142(i). In any event, the standard under section 3142(f) is that information exists that was not previously known that *has a material bearing on the issue of whether there are conditions of release that will reasonably assure the appearance of such person and the safety of*

4

*the community.* As will be discussed *infra,* Motley presents generalized concerns about the risk of contracting COVID-19 at WCDF; however, Motley never cites any evidence that serves to ameliorate Judge Hicks' concerns that Motley is a flight risk so as to justify reopening detention under section 3142(f).

The court finds that the analysis is more appropriately conducted under section 3142(i); however, as will be discussed further below, the court's inquiry will still take into account the original grounds for pretrial detention.

A defendant bears the burden of establishing that circumstances warrant temporary release under §3142(i). *Clark*, 2020 WL 1446895, at *2; *United States v. Buswell*, No. 11-CR-198-01, 2013 WL 210899, at *5 (W.D. La. Jan. 18, 2013) (collecting cases).

Up until this time, most courts addressing section 3142(i) have addressed the statute in the context of evaluating the necessity of the defendant assisting with preparing his or her defense. *See e.g. United States v. Cecrle*, No. 2:12-cr-400-JAD-GWF, 2014 WL 31674, at *4 (D. Nev. Jan. 3, 2014); *Buswell,* 2013 WL 210899, at *5; *United States v. Dupree*, 833 F.Supp.2d 241, 247 (E.D.N.Y. 2011); *United States v. Jeffries*, No. 3:10-cr-100, 2011 WL 182867, at *4 (E.D. Tenn. Jan 20, 2011).

Until now, there was little authority previously considered whether compelling reasons exist for temporary release; however, some courts have considered whether a defendant's medical condition may present a compelling reason. *See United States v. Rebollo-Andino*, 312 Fed.Appx. 346, 348 (1st Cir. 2009); *United States v. Scarpa*, 815 F.Supp. 88 (E.D.N.Y. 1993) (permitting release because of traumatic gunshot injury and terminal AIDS diagnosis that correctional authorities could no longer manage)); *United States v. Cordero Caraballo*, 185 F.Supp.2d 143, 144-47 (D.P.R. 2002) (ordering release of defendant who sustained multiple gun-

shot wounds, was partially paralyzed, could not walk, lost some arm function, and required supervision of 4-5 contracted security guards on a daily basis and the prison could not provide the required medical care). Courts have typically granted relief under section 3142(i) only "sparingly to permit a defendant's release where, for example, he is suffering from a terminal illness or serious injuries." *Hamilton*, 2020 WL 1323036, at *2.

Admittedly, courts have not previously faced the very unique set of circumstances that presently confront the world as a result of COVID-19. In the past few weeks though, and certainly in the weeks to come, courts around the country have addressed, and will continue to address, requests for release under section 3142(i) in the context of the COVID-19 pandemic, considering both the impact the pandemic has on the ability to prepare a defense as well as whether the health risks posed by the pandemic constitute a compelling reason for temporary release. *See e.g. United States v. Smoot*, No. 2:19-cr-20, 2020 WL 1501810 (S.D. Ohio Mar. 30, 2020); *United States v. Loveings*, Criminal No. 20-51, 2020 WL 1501859 (W.D. Penn. Mar. 30, 2020); *United States v. Bastianelli*, No. 17-305, 2020 WL 1493559 (W.D. Penn. Mar. 27, 2020) (citing other cases in the district); *United States v. Cox*, No. 2:19-cr-00271-RFB-VCF, 2020 WL 1491180 (D. Nev. Mar. 27, 2020); *United States v. Green*, Criminal No. 19-85, 2020 WL 1493561 (W.D. Penn. Mar. 27, 2020); *United States v. Snowden*, No. 19-CR-40081-JPG, 2020 WL 1492684 (S.D. Ill. Mar. 27, 2020); *U.S.A. v. Michaels,* No. SACR 16-76-JVS, 2020 WL 1482553 (C.D. Cal. Mar. 26, 2020); *United States v. Green*, No. 8:19-cr-304-T-17SPF, 2020 WL 1477679 (M.D. Fl. Mar. 26, 2020); *United States v. Steward*, S1:20cr0052 (DLC), 2020 WL 1468005 (S.D.N.Y. Mar. 26, 2020); *Clark*,  2020 WL 1446895; *United States v. Little*, S3 20 CR 57 (GBD), 2020 WL 1439979 (S.D.N.Y. Mar. 24, 2020); *United States v. Tang,* 2:20-cr-0054-KJD-DJA, ECF No. 44 (D. Nev. Mar. 23, 2020) (reopening detention but denying temporary

1 release under 3142(i); *Hamilton*, 2020 WL 1323036; *Stephens*, 2020 WL 1295155; *United States*

2 *v. Perez*, 19 Cr 297 (PAE), 2020 WL 1329225 (S.D.N.Y. Mar. 19, 2020). Courts are also being

3 faced with requests for release in the context of detained immigrants and convicted defendants.

4 The court need not address those circumstances here.

5    The court agrees with many of the other judges considering this issue that a request for

6 temporary release under section 3142(i) cannot be analyzed in a vacuum. The court must balance

7 the reasons advanced for temporary release against the risks previously identified that resulted in

8 detention. Therefore, whether temporary release is justified under section 3142(i) requires a case-

9 by-case analysis. That analysis may consider, among other relevant factors: the original grounds

10 for pretrial detention; the specific COVID-19 concerns advanced by the defendant; and, whether

11 the proposed release plan would mitigate or exacerbate COVID-19 risks to the defendant and

12 others. *See* Clark, 2020 WL 1446895, at *3. The court may not necessarily consider all of these

13 factors, and may not weigh them equally. *Id*.

14             **III. DISCUSSION**

15    Motley argues that incarcerated individuals are at special risk of infection given their

16 living situation, citing confirmed outbreak in prisons in China and Iran, and steps being taken in

17 some prisons in the United States to release elderly and sick prisoners, as well as the temporary

18 release of some pretrial detainees. He contends that current guidelines on screening do not go far

19 enough. He cites the fact that jails are visited by lawyers, parole and probation officers,

20 volunteers and others on a daily basis for potential spread of the virus. He also asserts that tests

21 are hard to come by. He claims that the housing situation at the WCDF, which places inmates in

22 small cells with beds close to one another, prevents detainees from engaging in social distancing

23 and self-quarantine recommendations of the Centers for Disease Control and Prevention (CDC).

He cites the sharing of limited toilets, sinks and showers, restrictions on movement, and limited access to personal hygiene items as precluding detainees from taking recommended precautions. He mentions that there are significant limitations on the detention facility's medical services. He further asserts that his detention will not allow him to easily stay in contact with his family. Finally, he contends that detention during the pandemic will impact his ability to prepare for his defense.

Motley states that his mother, who lives in Richmond, California, has offered to act as a third-party custodian, and he is amenable to home confinement and location monitoring as conditions of supervision. He acknowledges a prior felony conviction, but indicates that his adult criminal history beyond that is not extensive and he will not pose a danger to the community if released.

The Government opposes Motley's request, arguing that COVID-19 is not a compelling reason for release when Motley relies only on the mere possibility of infection as a basis for seeking release. The Government points out that Motley has not demonstrated that his risk of contracting COVID-19 while detained at WCDF is significantly higher than if he were released, that he is at high risk of becoming severely ill if he contracts COVID-19, or that the facility is unequipped to provide appropriate medical treatment if he were to become ill.

In his reply, Motley reiterates his argument that WCDF is not adequately equipped to manage COVID-19, and that the public health crisis stemming rom COVID-19 is a compelling reason for release or a changing circumstance warranting reopening of detention. Finally, Motley re-asserts his argument that release is necessary for preparation of his defense in light of COVID-19.

**A. Compelling Reason**

On March 11, 2020, the World Health Organization (WHO) officially classified COVID-19, a disease caused by a new strain of coronavirus, as a pandemic.[1] According to the Centers for Disease Control (CDC), as of the time this Order was written, t there were over 186,101 (up over 20,000 from the previous day) confirmed cases in the United States of COVID-19, and 3,603 deaths (up 743 from the previous day).[2] The actual number of people infected is likely much larger than that given the current capacity for testing. The rate at which COVID-19 is spreading and affecting communities around the world is alarming.[3]

The CDC has determined that older adults (65 and older) and people of any age who have serious underlying medical conditions are at higher risk for severe illness from COVID-19.[4] The CDC states that the following conditions could make a person higher risk: people with chronic lung disease or moderate to severe asthma; people with serious heart conditions; people who are immunocompromised including cancer treatment; people of any age with severe obesity or certain underlying medical conditions, particularly if not well controlled, such as those with diabetes, renal failure, or liver disease. *Id.*

---

[1] https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020, last visited March 31, 2020.

[2] *See* https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html, last visited April 1, 2020.

[3] *See* https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html, last visited April 1, 2020.

[4] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fspecific-groups%2Fhigh-risk-complications.html, last visited April 1, 2020.

Governor Steve Sisolak declared a State of Emergency in Nevada on March 12, 2020.[5] Nevada's K-12 schools have been closed since March 16, 2020, and will continue to be closed until at least April 30, 2020.[6] Also unprecedented is the closure of casinos in Nevada through at least the end of April.[7] On March 20, 2020, Nevada's Governor issued an order closing all non-essential businesses to the public and pleaded for individuals to stay in their homes.[8] On April 1, 2020, the Governor extended the order closing non-essential businesses and issued a directive for residents of Nevada to stay at home.[9] As of April 1, 2020, there are 1,279 COVID-19 cases in Nevada and 32 deaths; 143 of those cases are in Washoe County, and there have been four deaths in Washoe County.[10]

The District of Nevada has also taken measures to protect the public, staff, and litigants from the risks of COVID-19. *See* Temporary General Orders 2020-02, 2020-03, 2020-04, 2020-05. There is no doubt the danger posed by this virus is real, with entire economies and some

---

[5] *See* https://knpr.org/headline/2020-03/virus-prompts-nev-governor-emergency-order-cancellations, last visited April 1, 2020.

[6] *See* https://thenevadaindependent.com/article/sisolak-announces-statewide-public-school-closures-until-april-to-reduce-coronavirus-spread, last visited March 31, 2020; https://thenevadaindependent.com/article/sisolak-extends-covid-19-shutdown-until-end-of-april-urges-residents-to-shelter-in-place, last visited April 1, 2020.

[7] *See* https:www.reviewjournal.com/business/casinos-gaming/nevada-casinos-closing-for-30-days-following-state-order-1984236/, last visited March 31, 2020; https://thenevadaindependent.com/article/sisolak-extends-covid-19-shutdown-until-end-of-april-urges-residents-to-shelter-in-place, last visited April 1, 2020.

[8] *See* https:www.rgj.com/story/news/politics/2020/03/20/nevada-governor-orders-most-businesses-closed-midnight/2888908001, last visited April 1, 2020.

[9] *See* https://thenevadaindependent.com/article/sisolak-extends-covid-19-shutdown-until-end-of-april-urges-residents-to-shelter-in-place, last visited April 1, 2020.

[10] *See* https://www.ktvn.com/story/41917304/coronavirus-cases-across-nevada, last visited April 1, 2020.

healthcare systems around the world collapsing or on the verge of collapsing as the world attempts to contain the spread of the virus.

The court is mindful of the unprecedented magnitude of the COVID-19 epidemic and the extremely serious health risks it presents, particularly within the jail and prison setting. The CDC notes that "[c]orrectional and detention facilities can include custody, housing, education, recreation, healthcare, food service, and workplace components in a single physical setting. The integration of these components presents unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors."[11] The CDC cautions that "once community transmission is identified in a particular area," as it has been in Washoe County, "correctional facilities and detention centers are more likely to start seeing cases inside their walls." *Id.* The CDC has given interim guidance for steps that correctional and detention facilities should take for preparation, prevention and management to help reduce the risk of transmission and severe illness from COVID-19. *Id*. The CDC recommends that these facilities take the following steps in this regard: operational and communications preparations for COVID-19; enhanced cleaning/disinfecting and hygiene practices; social distancing strategies to increase space between individuals in the facility; limiting transmission from visitors; infection control, including recommended personal protective equipment and alternatives if there are shortages; screening protocols for incoming incarcerated/detained individuals, staff and visitors; medical isolation for confirmed and suspected cases and quarantine of contacts; healthcare evaluation for suspected cases, including testing for COVID-19; clinical care for confirmed and suspected cases; and considerations for persons at higher risk of severe disease. *Id.*

---

[11] *See* https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html, last visited April 1, 2020.

1   Nevertheless, in this context, a defendant should not be entitled to temporary release

2   under section 3142(i) based solely on generalized COVID-19 fears and speculation. *Clark*, 2020

3   WL 1446895, at *3. Instead, as noted above, the court must make an individualized

4   determination as to whether the COVID-19 health concerns present such a compelling reason in

5   a particular case that temporary release is warranted or that the conditions related to detention as

6   a result of COVID-19 make temporary release necessary for preparation of the defense.

7   **1. The Original Grounds for Pretrial Detention**

8   The court will consider the original grounds for the defendant's pretrial detention. *Clark*,

9   2020 WL 1466895, at *3; *Hamilton*, 2020 WL 1323036, at *1-2  (first considering the rebuttable

10  presumption under section 3142(e) before considering whether the COVID-19 pandemic

11  warranted temporary release under section 3142(i)); *Bararia*, 2013 WL 1907782, at *1-2

12  (considering circumstances leading to the defendant's revocation of pretrial release); *Buswell*,

13  2013 WL 210899, at *5 (observing that "the facts surrounding the underlying reasons for the

14  defendant's detention are relevant to the [section 3142(i)] analysis.").

15  For a defendant seeking temporary release under section 3142(i), it has already been

16  determined by a court that pretrial detention was warranted on the grounds that no condition or

17  combination of conditions would reasonably assure the defendant is not a flight risk and/or

18  would not pose a risk of harm to others. *Clark*, 2020 WL at 1446895, at *3. Therefore, the court

19  takes into consideration whether the defendant has presented such compelling reasons that

20  effectively override or at least sufficiently counterbalance the findings that originally justified the

21  pretrial detention order. *Id*.

22  Here, Judge Hicks found that Motley was a flight risk and that no conditions or

23  combination of conditions could reasonably assure his appearance for trial. While Motley claims

12

he is amenable to home confinement and location monitoring, he does not present any evidence to override or counterbalance Judge Hicks' original determination that conditions, including the conditions he presently proposes, would not reasonably assure his appearance at trial. In particular, the concerns persist regarding the fact that Motley was less than candid about some areas of his past. For example, he reported that he had lived with his mother prior to his arrest, but it took months to locate him to be arrested, and it was indicated that he only lived at his mother's residence twice a month and otherwise lived a transient lifestyle.

Moreover, while Motley proposes that he will submit to location monitoring, he does not take into account the feasibility of location monitoring by Pretrial Services under the circumstances presented by COVID-19. As will be discussed below, he also does not appreciate the risk that location monitoring might pose to Pretrial Services personnel under these circumstances.

In sum, Motley has not presented any evidence to alleviate the court's concerns that he remains a flight risk and that there are no conditions that could be fashioned to reasonably assure his appearance at trial. Therefore, this factor weighs against temporary release.

**2. Defendant's Specific COVID-19 concerns**

The court now turns to Motley's stated COVID-19 concerns. Motley raises only generalized concerns regarding the impact COVID-19 may have on him if he is detained during this pandemic. He asserts generalizations regarding prisons and detention facilities being at higher risk for an outbreak, and presents a conclusory assertion that the WCDF and WCSO are not adequately prepared to prevent an outbreak, and that they are further unprepared to manage an outbreak once the virus enters the facility. Motley also contends that he is a greater risk of contracting COVID-19 given the lack of opportunity for social distancing at WCDF.

Preliminarily, Motley admits that he is unaware of known cases of COVID-19 at WCDF. Additionally, Motley presents no evidence that he is at higher risk for severe illness from COVID-19. He is under the 65 year age range the CDC has indicated for high risk, and does not provide evidence that he has any serious underlying medical condition that puts him at risk.

Next, it is undisputed that the CDC has recommended social distancing in order to "flatten the curve" and slow transmission of the virus.[12] On March 29, 2020, President Trump extended social distancing guidelines that recommend avoiding social gatherings of ten or more people through at least the end of April, and perhaps longer.[13] The Governor of Nevada has also restricted Nevadans who are not living within the same household, working at or patronizing an essential business, or providing essential services, from gathering in groups of ten or more in any indoor or outdoor public area, and as noted above, on April 1, 2020, issued a directive for Nevadans to stay at home.[14]

WCDF is reportedly taking reasonable recommended precautions, including having medical staff screen inmates during intake for COVID-19 risk, isolating those that are deemed to be high risk, and promoting other recommended disinfecting and hygiene habits. WCDF is implementing CDC and World Health Organization guidelines, purchasing COVID-19 test kits

---

[12] *See* https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/get-ready.html, last visited, April 1, 2020 (setting forth steps to reduce transmission); The President's Coronavirus Guidelines for America, https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf, last visited April 1, 2020.

[13] *See* nytimes.com/2020/03/29/us/politics/trump-coronavirus-guidelines.html, last visited April 1, 2020.

[14]*See* https://nvhealthresponse.nv.gov/wp-content/uploads/2020/03/03.24-PUBLIC-GATHERING-DIRECTIVE_.pdf, last visited April 1, 2020; *see* https://thenevadaindependent.com/article/sisolak-extends-covid-19-shutdown-until-end-of-april-urges-residents-to-shelter-in-place, last visited April 1, 2020.

to the extent they are available, communicating best practices for hygiene to prevent the spread, encouraging employees to stay home if they are ill, and developing plans to separate high risk individuals who are more susceptible to COVID-19. Further, in the event an inmate becomes too ill to be cared for within the detention center, the inmate will be transported to a local medical facility for treatment. WCDF also changed visitation policies to suspend all in person visits, which will now be conducted remotely. In order to allow WCDF inmates access to families during the pandemic, the WCSO has set up "virtual visitations" through the internet and provides free phone calls for all inmates.[15]

While it is true that infected persons may now show symptoms until between two and fourteen days from exposure[16], and suspected that some percentage of infected persons may not show symptoms at all or very mild symptoms[17], that is also the case outside of WCDF. As for the argument that COVID-19 testing is not available for WCDF inmates, this is an ongoing problem that is not unique to prison and jail systems. This problem exists locally as well as statewide and nationwide.[18]

In his reply brief, Motley points to Magistrate Judge Weksler's order in *United States v. Cox*, 2:19-cr-00271-RFB-VCF, stating that "[g]iven the medical obstacles identified by major cities, it is doubtful that Southern Nevada Detention Center and the hospital at Pahrump will fare

---

[15] *See* https://www.washoesheriff.com/resources/files/COVID-19%20Backup%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.pdf, last visited April 1, 2020; *see also* ECF No. 59-1.

[16] *See* https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html, last visited March 31, 2020.

[17] *See* https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html, last visited April 1, 2020.

[18] *See* https://www.cnn.com/2020/03/28/politics/coronavirus-swabs-supplies-shortage-states/index.html, last visited April 1, 2020; https://www.rgj.com/story/news/2020/03/30/coronavirus-testing-las-vegas-washoe-county-health-department-nsphl/2932083001/, last visited April 1, 2020.

better than hospitals in New York or California." (ECF No. 141 at 2, n.2.) The undersigned likewise acknowledges the great difficulties that our local hospitals and medical centers in detention and correctional facilities are encountering and will continue to encounter during the course of this pandemic, but again, those difficulties are being faced by hospitals and correctional/detention centers around the world. The strain on healthcare resources will certainly be no different and may even be worse if Motley is released to Richmond, California, where COVID-19 is presently more widespread than in Washoe County. Moreover, Judge Weksler nevertheless denied Cox's motion seeking release.

In sum, Motley has not presented a specific COVID-19 risk. His arguments are too speculative or generalized to favor release. Motley cannot predict the extent to which COVID-19 cases might arise at WCDF any more than many Americans can predict how they might be exposed to the virus. Nor can Motley predict how WCSO might respond to an outbreak any more accurately than many Americans can predict how their local hospitals might respond, or might be able to respond. While inmates may not be able to fully adhere to optimal social distancing guidelines, these circumstances are generalized to all individuals in the prison system and are not unique to Motley. At this point, the court concludes that Motley is at a facility that has implemented meaningful measures to try to minimize the likelihood of the virus entering the facility. Therefore, this factor weighs against release.

**3. The Extent to Which the Proposed Release Plan is Tailored to Mitigate or Exacerbate the Defendant's Overall Covid-19 Risk**

The Bail Reform Act allows for temporary release only if the court determines such release is "necessary" for a compelling reason. 18 U.S.C. § 3142(i). In the context of COVID-19, this means the proposed temporary release plan should be tailored to mitigate the defendant's

1  overall COVID-19 risks, not exacerbate them. *Clark*, 2020 WL 1446895, at *6. Thus, the court

2  evaluates the extent to which the defendant's proposed release plan is tailored to mitigate or

3  exacerbate the defendant's overall COVID-19 risks. *Id*.

4       Here, Motley's proposed release plan includes home confinement with location

5  monitoring at the residence of his mother in Richmond, California. The plan does not address all

6  aspects of public health officials' recommendations and does not address other risk factors that

7  would arise if he were released from custody. There is currently no evidence that if someone at

8  WCDF were to contract COVID-19 that WCSO is unprepared to contain the virus and care for

9  those who may become infected. Instead, WCSO has established a comprehensive plan to

10  manage WCDF during the pandemic. The record is devoid of specific information suggesting

11  that WCDF would be unable to render appropriate medical care to Motley if he became ill.

12  Therefore, the speculative allegations regarding WCDF's inability to manage care of inmates

13  during the pandemic do not justify temporary release.

14       Motley also does not address the extent to which his risks could be exacerbated if he is

15  released to his mother's home.  There is no evidence as to how the proposed living situation

16  mitigates the risk of infection. For example, Motley does not explain who else has or will live in

17  or frequent the home or identify any screening practice or concrete COVID-19 precautions taken

18  there. Motley offers nothing more than speculation that home detention would be less risky than

19  living at WCDF, which at least has screening practices and other reasonable COVID-19

20  measures in place.

21       Further, Motley does not address the capacity of the health care system where he

22  proposes to reside and its capacity to provide him with adequate treatment if he were to contract

23  the virus. On March 4, 2020, California Governor Gavin Newsom proclaimed a state of

emergency in California as a result of the threat of COVID-19.[19] On March 19, 2020, Governor Newsom ordered all residents of California to stay at home. *Id.* In Richmond, California, where Motley seeks to be released, the Contra Costa Health Services issued an updated order that current shelter in place requirements will be extended at least through May 3, 2020.[20] As of the April 1, 2020, California had 9,599 confirmed COVID-19 cases (and 206 deaths), behind only New York and New Jersey.[21]  As of the same date, the number of patient's in California's ICUs has tripled, while the number of patients the state's hospitals has doubled.[22] In Contra Costa County, where Richmond is located, a local high school is slated to become a temporary hospital.[23] These facts do not reassure the court that Motley would be in any better position vis-à-vis COVID-19 if he were released to his mother's home in Richmond, California. Currently, there are many more confirmed cases of COVID-19 in California, and the Bay Area, where Motley proposes to be released, as compared to Washoe County in general. Again, there are no confirmed inmate cases at WCDF at this point.

In contrast, if Motley remains at WCDF, he has access to medical care should he become ill. WCSO collaborates with county and state health agencies, the CDC, and others to keep its employees and inmates safe. Motley has not demonstrated that his proposed release plan would necessarily better address his health concerns than if he were to remain in custody.

---

[19] *See* https://covid19.ca.gov/img/Executive-Order-N-33-20.pdf, last visited April 1, 2020.

[20] *See* http://www.ci.richmond.ca.us/3916/Shelter-in-Place, last visited April 1, 2020.

[21] *See* https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html, last visited April 1, 2020.

[22] *See* https://www.mercurynews.com/2020/03/31/coronavirus-californias-patients-in-icus-triples-hospitalizations-double/, last visited April 1, 2020.

[23] *See* https://www.nbcbayarea.com/news/coronavirus/east-bay-high-school-to-become-temporary-hospital-during-covid-19-crisis/2262557/, last visited April 1, 2020.

On balance, this factor appears to weigh against temporary release.

**4. The Likelihood that Defendant's Proposed Release Plan Would Increase COVID-19 Risks to Others**

In considering temporary release under section 3142(i) based on circumstances related to COVID-19, it is also appropriate to consider the likelihood the defendant's proposed release plan would increase COVID-19 risks to others, particularly if the defendant is likely to violate the conditions of release. *Clark*, 2020 WL 1446895, at *7.

A defendant who is unable to comply with conditions of release poses potential risks to law enforcement officers who are already tasked with enforcing shelter-in-place orders in many cities and counties and expend precious resources during this pandemic to return him to custody.

Supervising offenders in the community would actually place pretrial services officers at heightened risk of contracting the virus. "[L]ocation monitoring is not a limitless resource, nor is its installation and monitoring by the United States Pretrial Services officers without risk to those personnel (who must be trained and certified to install location monitoring) given the current recommendations regarding implementation of social distancing." *Martin*, 2020 WL 1274857, at *4.

Finally, Motley proposes being released to home confinement with his mother. Prior filings indicate that Motley's mother is 86 years old. Temporary release to live with his 86 year old mother would go against current guidance recommending limiting in person contact with elderly family members in places where there has been community transmission.[24]

Therefore, this factor weighs against temporary release.

---

[24] *See* https://www.aarp.org/health/conditions-treatments/info-2020/cdc-covid-19.html, last visited April 1, 2020.

1        In conclusion, Motley has not met his burden of demonstrating that the health risks posed

2 by COVID-19 are a compelling reason justifying temporary release.

3 **B. Necessary for Preparation of the Defense**

4        Motley also argues that temporary release is necessary for the preparation of his defense.

5 His attorney states that is unwise to visit a client at WCDF during the COVID-19 pandemic

6 because counsel may unknowingly expose Motley to COVID-19. In addition, he asserts that

7 there are limited means for contacting Motley at the jail.

8        The Government argues that Motley has not shown that in person visits are necessary to

9 prepare his defense, and that release would not necessarily improve his access to his attorney.

10        Courts considering whether pretrial release is necessary for preparation of defense have

11 analyzed: (1) the time and opportunity the defendant has to prepare for the trial and participate in

12 his defense; (2) the complexity of the case and volume of information; and (3) expense and

13 inconvenience associated with preparing for trial while incarcerated. *Cecrle*, 2014 WL 31674, at

14 *4. These typical considerations, however, are not necessarily relevant to the claims made by

15 defendants seeking release due to COVID-19 concerns.

16        WCDF has limited in-person visitation at the jail, and has provided for teleconferencing

17 and telephone communication with legal representatives and visitors during the COVID-19

18 pandemic. Motley will still have access to his attorney while detained during the pandemic

19 through these means. Even outside the jail, while law firms are deemed essential businesses in

20 Nevada and can still operate, they are supposed to follow social distancing guidelines; therefore,

21 attorneys and their clients outside of the jail/prison setting are also utilizing telephone and

22 videoconferencing modes of communication.

23

Motley does not present a declaration from counsel indicating how often he visited his counsel in person at WCDF before the pandemic, or stating why counsel cannot adequately prepare for trial utilizing telephonic and videoconferencing methods of communication. Nor does Motley's briefing address the fact that if Motley were released to confinement in his mother's home in Richmond, California, it is unlikely that counsel would travel to California to meet with him in person (particularly in light of the more widespread prevalence of COVID-19 in California, guidance to avoid non-essential travel, social distancing, and shelter-in-place and stay at home restrictions in California and Nevada). Instead, the current restrictions and guidance suggest that telephonic or videoconferencing would be the preferred mode of communication under the circumstances. Motley has a right to unmonitored calls or videoconferencing with his counsel from WCDF.

Even if it were otherwise feasible for Motley's counsel to visit Motley in person in California, Motley does not explain how the risk to his 86-year old mother would be ameliorated. Just as Motley asserts that his counsel might unknowingly expose Motel to the virus if permitted to visit Motley at WCDF, counsel could similarly unknowingly expose Motley and his 86-year-old mother if Motley was visited in person in California.

In addition, if Motley were released, he may not have access to *any* videoconferencing capabilities. Therefore, his ability to communicate with counsel during the COVID-19 pandemic may be greater while he is housed at WCDF.

The court does not find that Motley's temporary release is necessary for the preparation of his defense. The court is sympathetic to the circumstances surrounding Motley's ability to communicate with counsel during the COVID-19 pandemic while housed at WCDF; however, to

the extent these limitations exist while Motley is detained, they will also exist to a large degree if he is released.

Therefore, this factor also weighs against temporary release.

In sum, considering all of the facts before it at this time, the court does not find that Motley's temporary release is necessary to prepare his defense.

## IV. CONCLUSION

On balance, Motley has not set forth information to override or counterbalance the concerns identified by Judge Hicks in making the decision to detain Motley pending trial. Nor has Motley met his burden of demonstrating a compelling reason that would justify temporary release, or that the circumstances necessitate temporary release for preparation of his defense. Therefore, Motley's emergency motion to reopen detention (ECF No. 59) is **DENIED**.

**IT IS SO ORDERED**.

Dated: April 2, 2020

William G. Cobb
United States Magistrate Judge